**DUMAS & VAUGHN, LLC**
ASHLEY L. VAUGHN, OSB #114691
E-mail: ashley@dumasandvaughn.com
1000 SW Broadway, Suite 2150
Portland, OR 97205
Phone: 503-616-5007

**ROGUE LAW FIRM PC**
THOMAS R. ADAMS, OSB # 116588
E-mail: tom@roguelawfirm.com
600 NW Fifth St.
Grants Pass, OR 97526
Phone: 503-445-2103

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| P.N., V.G., and J.K., individuals proceeding under pseudonyms, | Case No. 6:25-cv-01297 |
| Plaintiffs, | **COMPLAINT** |
| v. | **Civil Rights Violations (42 U.S.C. § 1983); Negligence; Child Sexual Abuse** |
| STATE OF OREGON, by and through the OREGON YOUTH AUTHORITY; DIRECTOR KAREN BRAZEAU, an individual; DIRECTOR ROBERT JESTER, an individual; SUPERINTENDENT GARY LAWHEAD, an individual; SUPERINTENDENT MIKE COSNER, an individual; UNKNOWN DIRECTORS #1-3, individuals; and UNKNOWN SUPERINTENDENTS #1-3, individuals. | **JURY TRIAL DEMANDED** |
| Defendants. | |

**NATURE OF CASE**

1.      Plaintiffs P.N., V.G., and J.K. ("Plaintiffs") were sexually molested by Dr. Gary

Edwards, aka "Dr. Cold Fingers," in 2005 and 2006 when they were teenage boys committed to

the care and custody of the Oregon Youth Authority ("OYA").  OYA is a state agency operating

youth correctional facilities and transition programs throughout Oregon; its stated purpose is, in

part, to "provide youth with treatment, education, and other guidance to help them take

responsibility for their behavior" and "do so in safe, supportive environments that will help them

become responsible, community-minded citizens."[1]  Plaintiff P.N. and Plaintiff V.G. became

wards of OYA in March of 2005—Plaintiff P.N. was 17; Plaintiff V.G. was 16.  Plaintiff J.K.

became a ward of OYA in 2006, when he was only 14.  Each Plaintiff had initial intake physicals

at MacLaren Youth Correctional Facility in Woodburn, Oregon ("MacLaren").  Dr. Edwards, a

long-time pediatrician providing medical care to youth at MacLaren since 1977, performed their

physicals.  During those physicals, Dr. Edwards sexually abused the Plaintiffs.  Unknown to

Plaintiffs prior to that point, Dr. Edwards was referred to by MacLaren administration, staff, and

other youth as "Dr. Cold Fingers," for his ungloved abuse of inmates during his "medical"

exams.  Rather than report Dr. Edwards or take other action to prevent his continued abuse of

incarcerated youth, MacLaren leadership instead ignored and sometimes weaponized Dr.

Edwards' well-known actions, resulting in his continued abuse of youth like Plaintiffs for years.

**PARTIES**

2.      Plaintiff P.N. is a 37-year-old male resident of Oregon.  At all relevant times,

Plaintiff P.N. was a child in the legal and physical custody of OYA as an adjudicated youth.

"P.N." is proceeding under his initials to protect his privacy.

---

[1]      *About Oregon Youth Authority*,
https://www.oregon.govioyaiaboutoya/pagesidefault.aspx (last visited Feb. 13, 2025).

3.    Plaintiff V.G. is a 36-year-old male resident of the State of Washington.  At all relevant times, Plaintiff V.G. was a child in the legal and physical custody of OYA as an adjudicated youth.  "V.G." is proceeding under his initials to protect his privacy.

4.    Plaintiff J.K. is a 33-year-old male resident of the State of California.  At all relevant times, Plaintiff J.K. was a child in the legal and physical custody of OYA as an adjudicated youth.  "J.K." is proceeding under his initials to protect his privacy.

5.    OYA is a state agency operated by the State of Oregon.  OYA operates facilities across Oregon where youth offenders are incarcerated and treated, including MacLaren and Hillcrest Youth Correctional Facility ("Hillcrest").

6.    Defendant Karen Brazeau ("Defendant Brazeau") was employed by the State of Oregon as the Director of OYA from in or around 2001 through in or around 2004.  All of the conduct alleged below occurred within the scope of her employment for OYA.  She is sued in her individual capacity.

7.    Defendant Robert Jester ("Defendant Jester") was employed by the State of Oregon as the Director of OYA from in or around 2004 through in or around 2008.  All of the conduct alleged below occurred within the scope of his employment for OYA.  He is sued in his individual capacity.

8.    Defendant Gary Lawhead ("Defendant Lawhead") was employed by the State of Oregon as the Superintendent of MacLaren from 2002 through 2005.  All of the conduct alleged below occurred within the scope of his employment for OYA.  He is sued in his individual capacity.

9.    Defendant Mike Cosner ("Defendant Cosner") was employed by the State of Oregon as the Superintendent of MacLaren from 2005 through 2006.  All of the conduct alleged below occurred within the scope of his employment for OYA.  He is sued in in his individual capacity.

10.     Based on information and belief, Defendants Unknown Directors and Unknown Superintendents are unknown individuals employed by Defendant OYA who were aware of reports and risks that Dr. Edwards posed a danger of sexual abuse to youth in OYA custody prior to 2005.  All conduct alleged below occurred within the scope of their employment for OYA. They are sued in their individual capacity.  Defendant Brazeau, Defendant Jester, Defendant Lawhead, Defendant Cosner, and Defendants Unknown Directors and Superintendents are referred to below as "Individual Defendants."

## OYA'S FAILURE TO ADDRESS SEXUAL ABUSE COMPLAINTS

11.     County courts commit youth to OYA's legal and physical custody following youths' adjudication, and OYA serves adjudicated youths between the ages of 12 and 25.

12.     OYA's youth correctional facilities include Eastern Oregon Youth Correctional Facility, MacLaren Youth Correctional Facility, Oak Creek Youth Correctional Facility, Rogue Valley Youth Correctional Facility, Tillamook Youth Correctional Facility, and formerly Hillcrest Youth Correctional Facility, which is now closed (hereinafter collectively "youth correctional facilities").  OYA's transition programs include Camp Florence Youth Transitional Facility, Camp Riverbend Transitional Facility, Camp Tillamook Youth Transitional Facility, and Jackie Winters Youth Transition Program.

13.     The 2003 Prison Rape Elimination Act ("PREA")[2] established federal standards for preventing, detecting, monitoring, and responding to sexual abuse in both adult and juvenile custody settings.  "With a goal of being a national leader," OYA boasted that it quickly implemented PREA's standards.  On information and belief, PREA's passage was partially in reaction to localized awareness (including within OYA) of a sustained and systemic problem of sexual abuse of adjudicated youth in youth correctional facilities.

---

[2]     Oregon Youth Authority Issue Brief: Protecting Youth Offenders from Sexual Victimization (Feb. 2011).

14.     Beginning in 2005, OYA claimed it committed to "a zero-tolerance policy towards sexual and other threats of harm" as part of its implementation of PREA.[3]  OYA created a Professional Standards Office ("PSO") to purportedly document, track, and investigate abuse allegations.  OYA staff were also required to report any knowledge, suspicion, or youth reports (verbal or written) of abuse or harassment.  OYA established (1) a toll-free hotline that adjudicated youth could call to report sexual abuse and (2) a PREA compliance manager for each OYA facility.  Prior to OYA's establishment of the PSO in 2005, little to no OYA processes or policies existed for monitoring, reporting, investigating, and tracking allegations of sexual abuse committed by OYA personnel against juveniles in OYA's custody and control.

15.     Despite OYA's nominal PREA compliance, OYA has a long history of ignoring reports of staff sexually abusing youth in its facilities and fostering an environment where unchecked sexual abuse could thrive.  This environment stems in part from OYA failing to start or complete investigations of complaints involving staff sexual misconduct against youth; failing to complete functional investigations of staff sexual misconduct against youth; failing to report and/or intervene when staff or supervisors have reason to know or suspect that staff are committing sexual misconduct against youth; failing to ensure staff report concerns about sexual misconduct against youth; failing to properly train staff and supervisors, including on the PREA; failing to properly discipline staff; failing to install video surveillance to deter sexual misconduct; and failing to institute or properly implement policies that would protect youth from sexual misconduct by staff.

16.     Recently, OYA's systemic failures were exposed through a series of lawsuits and reports documenting ignored and unaddressed reports of sexual violence against youth in OYA custody dating back to at least the 1990s.

/ / /

---

[3]     *Id.*

17.     In 2021, an OYA audit identified "significant concerns" with PREA implementation within OYA.  The audit found that PREA coordinators were not reporting to the appropriate personnel within OYA and that at least one PSO Chief Investigator had mishandled PREA investigations.

18.     In 2025, the Oregon Department of Corrections ("DOC") released an OYA audit that found "significant" issues within the PSO department.[4]  The audit determined that since 2018, the OYA failed to complete approximately 32% of investigations (i.e., approximately 733 cases) involving allegations of abuse.  Further, potentially thousands of cases may have been investigated but not reviewed for appropriate disposition by the agency (i.e., corrective action or law enforcement referral).[5]  As of March 13, 2025, the audit identified over 3,400 cases with unknown adjudication.[6]

19.     The audit also discovered that several current and former staff reported to OYA leadership a "significant concern that the safety of the youth was at risk."[7]

20.     On March 13, 2025, Oregon's Department of Administrative Services ("DAS") released an Investigation Report (DAS Investigation Report) regarding allegations of mismanagement and governmental misconduct at the OYA.

21.     The DAS Investigation Report uncovered that during the DOC audit, "Several current and past OYA employees of the PSO allegedly reported the referenced problems with the

/ / /

---

[4]     "Oregon Youth Authority investigator failed to review thousands of cases, report finds," *Statesman Journal*, https://www.centraloregondaily.com/news/regional/oregon-youth-authority-investigator-caseslapse/article_881b7e9a-006a-11f0-86fa-27b9ce1acb0a.html (Mar. 13, 2025) (last visited June 20, 2025).

[5]     Oregon Dep't of Admin. Servs., Investigation Report, Case No. 123520 at 4 (Mar. 13, 2025). Investigator: Travis Hampton, Investigator, Chief Human Resources Office ("DAS Report").

[6]     *Id*.

[7]     *Statesman Journal*, https://www.statesmanjournal.com/story/news/local/oregon/2025/03/13/audit-oregon-youth-authority-investigatorfailed-review-cases/82369073007/ (last visited June 20, 2025).

youth cases to OYA administrators (past and present). These reports were allegedly met with an apathetic or passive response to the associated safety concerns of youth in custody.[8]

23.    As part of the DAS investigation, a different OYA former staffer was asked whether issues with the PSO impacted youth and staff safety. The staffer replied, "Yes it did" and "There's no other way to answer that question." The staffer added, "The kids deserve to be safe."[9]

23.    The DAS Investigation Report also sustained findings that key staff members engaged in improper governmental conduct from at least 2018 through 2021 by their inability or unwillingness to appropriately manage the agency's PSO. This conduct contributed to the inefficient operations of the agency and undermined the state's ability to fulfill its public mission to youth and staff.[10]

24.    Although the DAS Report only covered allegations dating back to 2019, there is no evidence to suggest that OYA had a *more* effective system for redressing sexual abuse allegations—including its implementation and compliance with PREA, management of PSO, and overall response to such allegations—*prior to* 2019. In fact, as discussed more below, all evidence surrounding OYA's handling of allegations against Dr. Edwards shows that the DAS Report merely shed light on the most recent iteration of OYA's ineptitude and malfeasance.

### DOCTOR "COLD FINGERS" EDWARDS

25.    At all relevant times, Dr. Edwards was employed or otherwise working on behalf of OYA as a pediatrician providing medical examination, diagnoses, and treatment to youths at MacLaren. He had been employed by OYA since 1977. Dr. Edwards was the primary medical provider at MacLaren from at least the late 1990s through at least 2007. Upon information and belief, Dr. Edwards was the only doctor working on site full-time at MacLaren during this time

---

[8]    DAS Report, at 7.
[9]    *Id*. at 17.
[10]    *Id*. at 11.

and, as such, oversaw the medical care for all adjudicated youth at MacLaren, including performing intake examinations, periodic physicals, and similar examinations.

26.     He was infamous for groping boys' genitals and penises with cold, ungloved hands during exams for no legitimate medical reason; digital penetration of boys' anuses; stroking boys' penises until erect; and masturbating boys, including in some instances to ejaculation.  Dr. Edwards sexually abused children during intake exams, follow-up physicals, and unrelated medical visits in his exam room when no nurse or chaperone was present.  As the sole doctor at MacLaren, Dr. Edwards handled all intake exams, physicals, and treatment of any reported medical issues.

27.     Dr. Edwards' abuse of boys was common knowledge amongst both the adjudicated youth and OYA staff, so much so that they dubbed him "Dr. Cold Fingers" and joked about him.  Older adjudicated youth warned newly arrived boys about Dr. Edwards.  MacLaren staff made jokes about Dr. Edwards abusing adjudicated youth.  Corrections officers threatened to send juveniles to Dr. Edwards as punishment if they misbehaved.

28.     Prior to Dr. Edwards's molestation of Plaintiffs in or around 2005 and 2006, multiple other youth had reported Dr. Edwards to staff and counselors at MacLaren, but nothing was done to prevent his continued molestation of inmates.  As alleged in other pending lawsuits:

a.     1999: Plaintiff E.N. alleges that Dr. Edwards sexually molested him multiple times beginning in 1999.  He alleges that OYA staff members threatened to send youth to Dr. Edwards as punishment.  *M.B., et al. v. State of Oregon, et al.*, Or. Circ. Ct. (Mult. Co. 25CV14777), ¶ 65;

b.     2002: Plaintiff T.B. alleges that Dr. Edwards sexually molested him multiple times beginning in or around 2002.  He alleges that he reported the abuse to a MacLaren staff member, who laughed it off and said, "That's Dr. Cold Fingers for you." *M.P., et al. v. State of Oregon, et al.*, Or. Circ. Ct. (Mult. Co. 25CV27198), ¶¶ 46-48;

c.      2001-2004: Plaintiff M.K. alleges that Dr. Edwards sexually molested him multiple times during medical examinations between in or around 2001 and 2004. He alleges that he reported the abuse to a male staff person and during periodic polygraph examinations during but, to his knowledge, no action was taken against Dr. Edwards. *M.B.,* ¶ 53;

d.      2002: Plaintiff B.N. alleges that Dr. Edwards sexually molested him multiples times beginning in or around 2002. He alleges that he reported to a nurse before one examination that he did not want Dr. Edwards to grope him again. He and other youth also openly discussed Dr. Edwards's conduct in the presence of OYA staff members. *M.P.*, ¶¶ 70-72;

e.      2002-2004: Plaintiff V.K. alleges that Dr. Edwards sexually molested him when he was 12 years old, in or around 2002 through 2004. He alleges that OYA staff threatened to send him to "Dr. Cold Fingers" if he misbehaved. *A.C., et al. v. State of Oregon, et al.,* Or. Circ. Ct. (Mult. Co. 25CV35433), ¶¶ 63-65;

f.      2003: Plaintiff A.B. alleges that Dr. Edwards sexually molested him multiple times in or around 2003. He alleges that he and other youth openly discussed Edwards's conduct in the presence of OYA staff members. *M.P.*, ¶¶ 59-61;

g.      2003-2004: Plaintiff N.N. alleges that Dr. Edwards sexually molested him multiple times in or around 2003 to 2004. He alleges that he reported Dr. Edwards's abuse to a guard, who responded "Yeah, he [Edwards] does that." He alleges that he also reported the abuse to a nurse who asked him how he knew the conduct was inappropriate, if he was not a doctor. *M.P.,* ¶¶ 52-55;

h.      2003-2004: Plaintiff C.S. alleges that Dr. Edwards sexually molested him multiple times in or around 2003 to 2004. He alleges that OYA staff warned him about Dr. Edwards when he arrived at MacLaren. *M.B.,* ¶ 73;

i.      2004: Plaintiff A.G. alleges that Dr. Edwards sexually molested him multiple times in or around 2004, at MacLaren and Hillcrest. He alleges that he reported the

abuse to OYA staff, some of whom responded by telling him that Edwards's conduct was standard medical procedure and some of whom threatened to send him to Edwards as punishment. *A.C.,* ¶¶ 50-52;

> j.    2004-2005: Plaintiff B.J. alleges that Dr. Edwards sexually molested him multiple times in or around 2004 and 2005. He alleges that OYA staff members joked about Edwards's inappropriate conduct. *M.B.,* ¶ 49;

> k.    2005: Plaintiff C.H. alleges that Dr. Edwards sexually molested him in or around 2005. He alleges that he reported the abuse to MacLaren staffers and to his Probation Officer, but that they dismissed his complaints, made jokes and threats about sending him to "Dr. Cold Fingers," and told him that no one would believe him. *A.C.,* ¶¶ 77-79; and

> l.    2005: Plaintiff B.C. alleges that Dr. Edwards sexually molested him in or around 2005. He alleges that he reported the abuse to a MacLaren staffer following his initial intake exam, but that the staffer laughed it off and told him to shut up. *A.C.*, ¶¶ 83-86.

29.    Numerous other plaintiffs in other lawsuits allege they were sexually abused by Dr. Edwards prior to or during 2005, but do not claim to have reported the abuse to OYA staff or leadership at the time.

30.    OYA empowered Dr. Edwards to perform the duties of a doctor. OYA knew that Dr. Edwards was in a position of authority, power, and trust over adjudicated youth, including Plaintiffs. OYA retained the right to control the means and methods used by Dr. Edwards. It was during the course of exercising these duties and authority on behalf of OYA that Dr. Edwards abused Plaintiffs.

### PLAINTIFF P.N.'S ABUSE

31.    Plaintiff P.N. realleges and incorporates by reference paragraphs 1-30.

/ / /

/ / /

32.    Plaintiff was adjudicated as a minor in Clackamas County, Oregon and sentenced to the custody of Defendant OYA in or around March 4, 2005, when he was 17 years old. Plaintiff had never been previously criminally convicted or incarcerated.

33.    At the outset of his incarceration, Defendant OYA sent Plaintiff to MacLaren to complete his initial intake, as OYA did with all youth at the time before transferring them to different facilities.

34.    Part of Plaintiff P.N.'s initial intake included a physical examination, performed by Dr. Edwards.  Initial physical examinations were standard procedure for incarcerated youth with OYA, but not having been previously incarcerated, Plaintiff did not know what to expect for the physical.

35.    Staff led Plaintiff to the exam room but left when Dr. Edwards entered.  No other staff member or chaperone was present during the exam.  Dr. Edwards instructed Plaintiff P.N. to sit on the bed, and instructed Plaintiff P.N. to breathe deeply, so he could listen to Plaintiff's lungs.  Dr. Edwards then instructed Plaintiff to lay down and undo his pants, and Edwards began palpating Plaintiff's stomach.  He progressed lower down Plaintiff's abdomen and instructed Plaintiff to pull down his underwear and pants.  Ungloved, Dr. Edwards groped Plaintiff's genitals for several minutes.  Dr. Edwards did not say anything throughout the entirety of the exam.

36.    Afterward, Plaintiff remembers other youth joking about Dr. Edwards, saying things like, to pass a physical you "have to go through Dr. Cold Fingers."

37.    OYA then moved Plaintiff P.N. to Hillcrest, where he served the remainder of his sentence.  Plaintiff P.N. was released from custody in May of 2012.

38.    Plaintiff never knew Dr. Edwards's real name until March of 2025, when he read a news article about another lawsuit filed against Defendant OYA arising from Edwards's sexual abuse of other incarcerated youth.  He only knew him by his nickname "Dr. Cold Fingers."

39.     Plaintiff has never again been criminally convicted or incarcerated to this day.

40.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff P.N. suffered in the past, continues to suffer, and will suffer in the future psychological injuries, including but not limited to pain and suffering and emotional distress.  All of these injuries caused and will continue to cause P.N. noneconomic damages an amount to be determined by a jury at trial.

## PLAINTIFF V.G.'s ABUSE

41.     Plaintiff V.G. realleges and incorporates by reference paragraphs 1-40.

42.     Plaintiff V.G. was adjudicated as a minor in Washington County, Oregon and sentenced to the custody of Defendant OYA in or around March 5, 2005, when he was 16 years old.  Plaintiff had never been previously criminally convicted or incarcerated.

43.     At the outset of his incarceration, Defendant OYA sent Plaintiff V.G. to MacLaren to complete his initial intake, as OYA did with all youth at the time before transferring them to different facilities.

44.     Part of Plaintiff V.G.'s initial intake included a physical examination, performed by Dr. Edwards.  As with Plaintiff P.N., Plaintiff V.G. had never before experienced a physical prior to incarceration, because he had never previously been incarcerated.

45.     During the physical, Dr. Edwards did not wear gloves.  He put one bare hand up Plaintiff V.G.'s shirt to touch his chest, then abruptly moved his bare hand down V.G.'s pants and fondled his genitals for several minutes.  There was no chaperone or any other individual in the room.

46.     OYA then moved Plaintiff V.G. to Hillcrest, where he served the remainder of his sentence.  Plaintiff V.G. was released from custody in March of 2008.  Plaintiff has never again been criminally convicted or incarcerated to this day.

/ / /

Page 11 -   **COMPLAINT**

47.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff V.G. suffered in the past, continues to suffer, and will suffer in the future psychological injuries, including but not limited to pain and suffering and emotional distress.  All of these injuries caused and will continue to cause V.G. noneconomic damages in an amount to be determined by a jury at trial.

## PLAINTIFF J.K.'s ABUSE

48.     Plaintiff J.K. realleges and incorporates by reference paragraphs 1-47.

49.     Plaintiff J.K. was adjudicated as a minor in Yamhill County, Oregon and sentenced to the custody of Defendant OYA in or around August of 2006, when he was 14 years old.  Plaintiff had never been previously criminally convicted or incarcerated.

50.     At the outset of his incarceration, Defendant OYA sent Plaintiff J.K. to MacLaren to complete his initial intake, as OYA did with all youth at the time before transferring them to different facilities.

51.     Part of Plaintiff J.K.'s initial intake included a physical examination, performed by Dr. Edwards.  As with the other Plaintiffs, Plaintiff J.K. had never before experienced a physical prior to incarceration, because he had never previously been incarcerated.

52.     Before the physical, Plaintiff was warned by other youth about Dr. Edwards. They told him that Edwards did not wear gloves and would ask where Plaintiff was from before grabbing his genitals.  Plaintiff did not believe he could tell staff or refuse to go through with the physical.  During the physical, Dr. Edwards did not wear gloves.  He instructed Plaintiff J.K. to lie down.  Dr. Edwards asked Plaintiff where he was from, then abruptly grabbed Plaintiff's genitals and fondled him for several minutes.  There was no chaperone or any other individual in the room.

/ / /

/ / /

Page 12 -   **COMPLAINT**

53.     Plaintiff had at least one additional appointment with Edwards while he was housed at the intake tent at MacLaren.  OYA then moved Plaintiff J.K. to Hillcrest, where he served the remainder of his sentence.

54.     Plaintiff J.K. remembers other youth and staff members joking about "Dr. Cold Fingers" while he was incarcerated.  He never told any staff about the incident because, given their treatment of the youth, he did not believe anyone would care.  He did not file a complaint through the formal grievance system because he was concerned about retaliation.

55.     Plaintiff J.K. was released from custody in March of 2011.  Plaintiff has never again been criminally convicted or incarcerated to this day.

56.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff J.K. suffered in the past, continues to suffer, and will suffer in the future psychological injuries, including but not limited to pain and suffering and emotional distress.  All of these injuries caused and will continue to cause J.K. noneconomic damages in an amount to be determined by a jury at trial.

57.     Less than two years before the filing of this complaint, Plaintiffs discovered the casual connection between their abuse, their resulting injuries distinct from the abuse itself, and the responsibility of Defendants in causing those injuries.  Plaintiffs did not discover (and could not reasonably have discovered) at an earlier time the casual connection between the abuse and the damages suffered because of the abuse, particularly because Plaintiffs did not understand at the time of the molestation that such conduct constituted child abuse.  Further, even if they had understood that Dr. Edwards's conduct was wrong at the time, they were prevented from telling any responsible adults about the conduct out of fear of punishment, recrimination, and retaliation.  Finally, Plaintiffs did not and could not reasonably have discovered Defendants'

/ / /

/ / /

prior knowledge of Dr. Edwards's inappropriate conduct, as well as Defendants' responsibility for Plaintiffs' abuse, until the publishing of news articles in March of 2025 making those facts public for the first time.

## SUPERVISORY LIABILITY

58.    Plaintiffs reallege and incorporate by reference paragraphs 1-56.

59.    Directors and Superintendents were employed by the OYA at the time that Dr. Edwards sexually abused Plaintiffs.  They were aware of OYA's long history of turning a blind eye to reports of staff sexually abusing youth at its facilities.  They failed in their respective supervisory roles to prevent the sexual abuse of Plaintiffs, including the following failures:

   a.    Failing to investigate reports of abuse properly or at all;

   b.    Failing to refer known incidents to outside investigative agencies;

   c.    Failing to install sufficient security and monitoring equipment at McLaren, Hillcrest, and Riverbend to deter the abuse of minors;

   d.    Failing to properly implement, monitor, and sustain PREA standards, including timely appointment of PREA Compliance Manger and ensuring adherence at MacLaren and all other facilities to the rules and guidelines set out by PREA and implemented by the OYA;

   e.    Failing to implement policies and procedures to adequately vet job applicants, particularly for those positions requiring one-on-one interaction with juveniles, for a history of or proclivity to child sex abuse;

   f.    Failing to train OYA's employees to recognize and properly respond to warning signs and dangers of child abuse and to report any and all signs or reports of sexual abuse; and

   g.    Facilitating a general culture in which the abuse of juveniles was accepted.

60.     The State of Oregon and OYA are entrusted with the rehabilitation of children adjudged delinquent.  When the State imprisons these vulnerable children in detention facilities and thereby removes them from their families and their communities, the State removes their opportunities for self-protection, and the State is instead entrusted with caring for and protecting these completely dependent youth.

61.     Given the vulnerability of the juvenile population housed at OYA facilities, the OYA's history of a sustained and systemic problem of youth in its custody being targeted for sexual assault, and the widespread knowledge among MacLaren staff and adjudicated youth of Dr. Edwards' predatory nature, a supervisor exercising a reasonable amount of care would have immediately noticed and recognized the predatory threat that Dr. Edwards represented to Plaintiffs.

62.     By failing to ensure that the policies enacted by his own agency to prevent, investigate, and respond to sexual abuse were followed or enforced, and by ignoring credible information that staff – including "Dr. Cold Fingers" – were engaging in sexual abuse of youth, Director consciously disregarded widespread sexual abuse of youth at OYA facilities, thus creating the conditions that allowed Dr. Edwards to sexually abuse Plaintiffs.  This behavior evinced a deliberate indifference to Plaintiffs' right to be free from coerced sexual contact.

63.     By failing to ensure that OYA's policies to prevent, investigate, and respond to sexual abuse were followed or enforced at MacLaren, and by ignoring credible information that staff – including "Dr. Cold Fingers" – were engaging in coercive sexual relationships with youth, Directors and Superintendents consciously disregarded widespread sexual abuse of youth at MacLaren, thus creating the conditions that allowed Dr. Edwards to sexually abuse Plaintiffs.

/ / /

/ / /

/ / /

## FIRST CLAIM FOR RELIEF:

### NEGLIGENCE
(Oregon State Law)
*Against State of Oregon, OYA*

64.     Plaintiffs reallege and incorporate herein paragraphs 1-63.

65.     By taking custody of Plaintiffs and *acting in loco parentis* towards them during the period of their confinement, Defendant OYA entered into a special relationship with Plaintiffs.  At all material times, Defendants were in a special relationship with Plaintiffs by virtue of their statutory obligations to children in their care generally, and to Plaintiffs specifically.  As their legal and physical guardian and custodian, Defendants owed Plaintiffs a heightened duty of care to provide a safe environment and protect them from abuse and injury while in OYA's care.

66.     Defendant OYA breached that duty by acting or failing to act in one or more of the following ways.  Additionally, Defendant OYA created a foreseeable risk that incarcerated youth, including Plaintiffs, would suffer the type of harm that Plaintiffs eventually suffered— sexual abuse by Dr. Edwards—by unreasonably acting or failing to act in one or more of the following ways:

        a.     Failing to ensure that a chaperone or other staff person was present to observe Dr. Edwards's examinations of youth;

        b.     Failing to notice, investigate, or intervene to protect Plaintiffs from Dr. Edwards sexual conduct;

        c.     Failing to properly supervise Dr. Edwards;

        d.     Failing to properly heed, investigate, or otherwise take any action in response to reports of inappropriate conduct and sexual abuse by Dr. Edwards;

        e.     Failing to report or refer reports of inappropriate conduct and sexual abuse by Dr. Edwards to outside investigative agencies;

f.    Failing to establish a safe and confidential reporting system for youth to report allegations of wrongdoing by staff members;

g.    Failing to ensure that youth were educated about and using any existing reporting systems to report allegations of wrongdoing by staff members; and

h.    Failing to properly vet, hire, train, and retain qualified personnel, including medical providers, corrections officers, and other facility staff.

67.    Further, Plaintiffs had a legally protected interest in being free from sexual abuse by OYA staff in charge of their safety and wellbeing.

68.    Based on Defendant OYA's knowledge of Dr. Edwards's inappropriate conduct predating or coinciding with his abuse of Plaintiffs, as partially described above at paragraphs 25-29, OYA allowed or permitted child abuse.

69.    As a direct and foreseeable result of Defendant OYA's negligence, Plaintiffs suffered the injuries and incurred the damages described in paragraphs 40, 47, and 56.

## SECOND CLAIM FOR RELIEF:

### 42 U.S.C. §1983 – Civil Rights Violation
(Substantive Due Process – Violation of 14th Amendment)
*Against all Individual Defendants*

70.    Plaintiffs reallege and incorporate by reference paragraphs 1-69.

71.    At all relevant times, all Individual Defendants were employed by Defendant OYA as employees of a youth correctional facility.

72.     All Individual Defendants were acting under color of state law when they engaged in the alleged wrongful conduct.

73.    Plaintiffs were confined at MacLaren as adjudicated youth at the time Dr. Edwards abused them.

74.     Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiffs in a sexual manner without a legitimate penological or medical justification or purpose.

75.     Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiffs in a sexual manner that was not reasonably related to any legitimate government objective.

76.     Dr. Edwards acted, at least in part, for his own sexual gratification.

77.     Dr. Edwards's sexual abuse of Plaintiffs constituted a substantial departure from professional judgment, practice or standards.

78.     Dr. Edwards failed to provide for Plaintiffs' reasonable safety while confined in OYA facilities by engaging in coerced sexual conduct with Plaintiffs.

79.     Through the failures alleged above, Individual Defendants created the conditions at MacLaren, under which Dr. Edwards's sexual abuse of Plaintiffs was possible.

80.     Those conditions put Plaintiffs at substantial risk of suffering serious harm, namely, the risk that Plaintiffs would be sexually abused by OYA staff or employees.

81.     Individual Defendants failed to take reasonable available measures to abate the risk that Plaintiffs would be sexually abused by Dr. Edwards.

82.     Individual Defendants, in failing to act or protect Plaintiffs from sexual abuse by Dr. Edwards, failed to provide for Plaintiffs' reasonable safety.

83.     Individual Defendants' failure to take reasonably available steps, as alleged above, constituted a substantial departure from professional judgment, practice, or standards.

84.     In so doing, given Defendants' knowledge of OYA's history and allegations against Dr. Edwards, Individual Defendants evinced deliberate indifference to Plaintiffs' rights to be free from coerced sexual contact with Dr. Edwards.

85.     As a direct and foreseeable result of Defendant OYA's negligence, Plaintiffs suffered the injuries and incurred the damages described in paragraphs 40, 47, and 56.

86.     Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

### THIRD CLAIM FOR RELIEF:

**42 U.S.C. §1983 – Civil Rights Violation**
(Cruel and Unusual Punishment – Violation of 8th Amendment)
*Against All Individual Defendants*

87.     Plaintiffs reallege and incorporate by reference paragraphs 1-86.

88.     At all relevant times, all Individual Defendants were employed by Defendant OYA as employees of a youth correctional facility.

89.      All Individual Defendants were acting under color of state law when they engaged in the alleged wrongful conduct.

90.     Plaintiffs were confined at MacLaren as adjudicated youth at the time Dr. Edwards abused them.

91.     Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiffs in a sexual manner without a legitimate penological or medical justification or purpose.

92.     Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiffs in a sexual manner that was not reasonably related to any legitimate government objective.

93.     Dr. Edwards acted, at least in part, for his own sexual gratification.

94.     Dr. Edwards's sexual abuse of Plaintiffs constituted a substantial departure from professional judgment, practice or standards.

95.     Dr. Edwards failed to provide for Plaintiffs' reasonable safety while confined in OYA facilities by engaging in coerced sexual conduct with Plaintiffs.

96.     Through the failures alleged above, Individual Defendants created the conditions at MacLaren, under which Dr. Edwards's sexual abuse of Plaintiffs was possible.

97.     Those conditions put Plaintiffs at substantial risk of suffering serious harm, namely, the risk that Plaintiffs would be sexually abused by OYA staff or employees.

98.     Individual Defendants failed to take reasonable available measures to abate the risk that Plaintiffs would be sexually abused by Dr. Edwards.

99.     Individual Defendants' failure to take reasonably available steps, as alleged above, constituted a substantial departure from professional judgment, practice, or standards.

100.     In so doing, given Defendants' knowledge of OYA's history and allegations against Dr. Edwards, Individual Defendants evinced deliberate indifference to Plaintiffs' rights to be free from coerced sexual contact with Dr. Edwards.

101.     As a direct and foreseeable result of Defendant OYA's negligence, Plaintiffs suffered the injuries and incurred the damages described in paragraphs 40, 47, and 56.

102.     Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

### FOURTH CLAIM FOR RELIEF:

**Sexual Battery of Child – *Vicarious Liability***
(Oregon State Law)
*Against Defendant OYA*

103.     Plaintiffs reallege and incorporate by reference paragraphs 1-102.

104.     While acting in the course and scope of his agency for Defendant OYA, Dr. Edwards engaged in a harmful or offensive touching of Plaintiffs to which Plaintiffs did not and could not consent, as described above.

105.    Dr. Edwards performed his responsibilities as a pediatrician and created doctor-patient relationships with Plaintiffs initially out of a desire to fulfill his duties for Defendant OYA.  The actions he took as a pediatrician in purporting to examine Plaintiffs led directly to and resulted in his sexual abuse of Plaintiffs.

106.    As a direct result and consequence of Defendants' wrongful conduct, Plaintiffs suffered the injuries and incurred the damages alleged in paragraphs 40, 47, and 56.

## PRAYER FOR RELIEF

WHEREFORE, each Plaintiff prays for judgment against each Defendant, as follows:

1.    If successful on any of Plaintiffs' claims for relief, compensatory damages for each Plaintiff in an amount to be determined by a jury at trial;

2.    If successful on Plaintiffs' Second and/or Third Claims for Relief, attorneys fees incurred, as allowed under 42 U.S.C. § 1988;

3.    Plaintiffs' disbursements and incurred costs; and

4.    Any other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a jury trial.

DATED this 23rd day of July, 2025.


*/s/ Ashley L. Vaughn*
Ashley L. Vaughn, OSB #114691
**DUMAS & VAUGHN, LLC**

Thomas R. Adams, OSB #116588
**ROGUE LAW FIRM PC**
*Attorneys for Plaintiffs*